## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02166-NYW-KLM

ALAN D. CHALEPAH,

      Plaintiff,

v.

CANON CITY AND ROYAL GORGE ROUTE a/k/a Royal Gorge Route Railroad,

      Defendant.

---

## OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on Defendant Canon City & Royal Gorge Route, a/k/a Royal Gorge Route Railroad's ("RGRR") Motion for Summary Judgment. [#60, filed November 3, 2014]. Also before the court is RGRR's Motion to Strike Portions of Sur-Reply to Defendant's Motion for Summary Judgment ("Motion to Strike"). [#87, filed May 18, 2015]. After carefully considering the Motions and related briefing, the entire case file, and the applicable case law, the Motion for Summary Judgment is GRANTED and the Motion to Strike is DENIED.

## BACKGROUND

      Plaintiff Alan D. Chalepah ("Plaintiff" or "Mr. Chalepah") initiated this lawsuit on August 13, 2013 by filing a *pro se* Complaint. [#1]. The court granted Plaintiff leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915 on August 20, 2013. [#5, #6]. In the Complaint, Mr. Chalepah asserts various claims associated with the termination of his employment with RGRR, as follows: (1) termination based on Mr. Chalepah's color and/or race in violation of

Title VII of the Civil Rights Act of 1964 (disparate treatment) [#1 at ¶¶ 19, 32-49]; (2) breach of contract and/or promissory estoppel [*id.* at ¶¶ 50-65]; (3) negligence [#1 at ¶¶ 66-70]; (4) intentional infliction of emotional distress/harassment [*id.* at ¶¶ 73-78]; (5) intentional interference with contractual relationship [*id.* at ¶¶ 79-85]; and (6) abuse of process [*id.* at ¶¶ 86-92]. Plaintiff seeks compensatory and exemplary damages and injunctive relief. [*Id.* at 23-24].

In support of his claims, Mr. Chalepah set forth several pages of factual allegations, some of which are recited here. Plaintiff self-identifies as an American-Indian male. [#1 at 3 ¶ 11A]. Beginning on or about May 11, 2007, Mr. Chalepah was employed by RGRR. In 2012, the former Superintendent of Operations announced his resignation and Mr. Chalepah expressed interest in the position to the Assistant General Manager, Glenn Hayes ("Mr. Hayes"). [*Id.* at ¶11B] Subsequently, unbeknownst to Mr. Chalepah, the position of Superintendent of Operations was divided into two positions: a Manager of Operations and a Chief Mechanical Officer. [*Id.* at 4 ¶ 11C] Mr. Chalepah was not interviewed for either position, and the position of Manager of Operations was filled by Devon Cacy ("Mr. Cacy"), an individual who had less experience than Mr. Chalepah. [*Id.* at 4 ¶ 11E.] Mr. Chalepah was displeased with the fact that he was neither interviewed for nor given the position. [*Id.* at ¶ 11F]

On or about November 1, 2012, Mr. Chalepah confided in Mr. Cacy, a personal friend, that he was upset and was contemplating contacting the Equal Employment Opportunity Commission ("EEOC"). [*Id.* at ¶ 11G]. Mr. Chalepah does not know whether Mr. Cacy, in turn, told any of the supervisors at RGRR of his intent to contact the EEOC. [*Id.*] On or about November 5, 2012, Mr. Chalepah received a text message from his supervisor to hurry and return with a company gas card because another employee needed to fuel a work truck. [*Id.* at ¶ 11I]. He responded "no s**t why don't he drive down here." [*Id.*] On or about November 5, Mr.

Chalepah was suspended by RGRR through Mr. Hayes and Jennifer Keegan ("Ms. Keegan"), an RGRR Human Resources representative, based in part on the text and unspecified "things that have come to [the] attention [of RGRR management]." [*Id.* at ¶ 11L]. Mr. Chalepah was then terminated a day or two later after he purportedly contacted two employees, Thomas Prather and Wayne Gay ("Mr. Gay"), to create conflict and "help to build a case against the company." [*Id.* at ¶¶ 11M-N.] The Complaint contains no allegation that Mr. Chalepah had filed any complaint with the EEOC or made any direct complaint to either Mr. Hayes or Ms. Keegan that RGRR had terminated him due to his race.

On September 16, 2013, RGRR filed an Answer [#14] and the Parties consented to the jurisdiction of a United States magistrate judge. [#15]. The case was subsequently referred to Magistrate Judge Boland for all purposes pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D.C.COLO.LCivR 72.2. [#19]. The matter was reassigned to the undersigned Magistrate Judge on February 10, 2015. [#78].

On October 30, 2013, Judge Boland presided over a Scheduling Conference at which he ordered the Parties to amend pleadings on or before December 13, 2013, complete discovery by April 30, 2014, file dispositive motions by May 30, 2014, and prepare for a Final Pretrial Conference to be held August 7, 2014. [#27, #28, #29]. The court also set a four-day trial to begin September 15, 2014. [#31]. At that time, Mr. Chalepah appeared *pro se*. [*Id.*] Plaintiff subsequently filed a Motion for appointment of voluntary counsel, which the court granted on December 20, 2013. [#36, #37].

On March 29, 2014, Plaintiff's current counsel, Titus Peterson ("Plaintiff's counsel" or "Mr. Peterson"), was appointed pursuant to the United States District Court's Pilot Program to Implement a Civil Pro Bono Panel. [#39]. Mr. Peterson entered his appearance on May 2, 2014

[#40], and on May 14, 2014 filed a Motion to Continue Trial [#41], Motion for Extension of Time to Conduct Discovery and File Dispositive Motions [#42], and Motion for Hearing regarding the status of the case [#43].  On June 2, 2014, the court held a Motions Hearing and Status Conference at which Judge Boland extended the discovery cut-off date to October 3, 2014 and the dispositive motion deadline to November 3, 2014, and vacated the trial date.  [#48, #50].

On November 3, 2014, RGRR filed the pending Motion for Summary Judgment along with seventeen attachments.  [#60 - #66].  On November 23, 2014, Plaintiff, through his counsel, filed a Response to the Motion for Summary Judgment in which he concedes the claims for breach of contract and/or promissory estoppel, negligence, and intentional interference with contractual relationship, leaving only the claims for (1) discrimination based on race and/or color in violation of Title VII of the Civil Rights Act ("discrimination claims"), (2) intentional infliction of emotional distress/harassment, and (3) abuse of process.  [#69 at 24].  The Response is supported in large part by a single-paragraph affidavit that states Plaintiff reviewed the verified facts section contained therein and "swear[s] that these facts are true."  [#69 and #69-1].  RGRR filed its Reply on December 11, 2014.  [#74].

On December 19, 2014, Plaintiff filed a Motion for Leave to file Amended Response to Defendant's Motion for Summary Judgment ("Motion for Leave"), arguing that the inexperience of Plaintiff's counsel in federal court justified amendment.[1]  [#75].  Concerned about the representations made in the Motion for Leave, the court held a hearing on April 24, 2014 and required Mr. Chalepah to appear in person.  [#82].  After he confirmed that he wished to proceed with Mr. Peterson, the court permitted Plaintiff to file a Sur-Reply of not more than ten pages on

_____

[1] Plaintiff earlier referred to the inexperience of and other demands upon his counsel in moving to amend his Complaint, which this court denied. *See* [#57, #83].  This court granted a Second

4

or before May 8, 2015 to address facts that he intended to dispute specifically but perhaps did not through his affidavit, but otherwise denied Plaintiff's Motion for Leave.  [#82].  *See* Fed. R. Civ. P. 56(e)(1).  Plaintiff timely filed a Sur-Reply.  [#94].  On May 18, 2015, RGRR filed the pending Motion to Strike.  [#87].  Plaintiff opposed the Motion to Strike on June 12, 2015 [#89], and RGRR filed a Reply on June 29, 2015 [#90].

## STATEMENT OF UNDISPUTED FACTS

Mr. Chalepah submitted approximately 360 pages of exhibits in response to RGRR's Motion for Summary Judgment.  Despite sorting through these voluminous documents, the court has not found, and Plaintiff has not specifically pointed out, any admissible evidence that creates a genuine issue of material fact with respect to his remaining claims of (1) discrimination; (2) intentional infliction of emotional distress; or (3) abuse of process.  For instance, Plaintiff asserts throughout his Response that Mr. Cacy was not qualified, or was less qualified than he, for the Operations Manager position.  *See* [#69 at 2 and 9 at ¶ 21 ("Mr. Cacy had less tenure on the job and less experience on the job than Mr. Chalepah.")].  However, Plaintiff never points to any evidence that time on the job was the primary consideration for the hiring decision, or that Mr. Cacy did not meet the minimum qualifications or could not perform the functions of the job.  *See Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978) (explaining that on summary judgment, the trial court "is not required to consider what the parties failed to point out").  As a result, Defendant's proposed facts that are appropriately supported by citations to the record (as set forth below), to which Plaintiff has not pointed to specific, admissible evidence to challenge, are considered uncontroverted.

---

Motion to Amend Complaint [#80] on May 12, 2015, to the extent Plaintiff sought to add a demand for a jury trial.  [#86].

In addition, RGRR asserts in its Motion for Summary Judgment that its First Requests for Admission should be deemed admitted because Plaintiff did not respond or object to them, and at no point requested additional time to do so. [#60 at 11]. Rule 36 of the Federal Rules of Civil Procedure provides:

> A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. A shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court.

Fed. R. Civ. P. 36(a)(3). A matter admitted under Rule 36 "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." *Id.* at 36(b). RGRR served Plaintiff with the Requests for Admission on March 28, 2014, at which time Plaintiff was proceeding *pro se*. *See* [#62-1]. Mr. Peterson was appointed to represent Plaintiff the following day [#39], though did not enter his appearance in this matter until May 2, 2014 [#40], after which discovery was extended to October 3, 2014. As an initial matter, *pro se* litigants must follow the same rules of procedure that govern other litigants. *Nielsen v. Price,* 17 F.3d 1276, 1277 (10th Cir. 1994). Mr. Chalepah asserts in his Response, filed November 23, 2014, that he simply forgot to give the Requests for Admissions to Mr. Peterson and that the Motion for Summary Judgment was "the first time Plaintiff's counsel can recall ever being made aware of late 'Admissions.' This is not to say that it might not have occurred." [#69 at 20]. And yet Plaintiff did not move the court pursuant to Rule 36(a)(3) for additional time to respond or object to the Requests for Admissions, or pursuant to Rule 36(b) to amend or withdraw the admissions[2] –

---

[2] Subject to Rule 16(e), the court may permit withdrawal or amendment if (1) it would promote the presentation of the merits and if (2) the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action. *Id.* The prejudice contemplated by Rule 36(b) is more than simply inconvenience to the party. *See Raiser v. Utah County*, 409 F.3d 1243, 1246 (10th Cir. 2005). Instead, "the prejudice relates to the difficulty a party may have in

despite RGRR's argument in its Motion that admission of the eight requests should result in an award of summary judgment to it on multiple claims. [#60 at 12-13]. Accordingly, Defendant's First Requests for Admission are deemed admitted.

<u>Plaintiff's Employment with RGRR</u>

RGRR is an independently owned Colorado company that operates a scenic train service through the Royal Gorge canyon near Canon City, Colorado. [#61-1 at ¶ 2]. RGRR also provides special events, tours, and meal services to its customers and guests. [*Id.*] Mr. Chalepah began working for RGRR on May 11, 2007 as a cook. [*Id.* at ¶ 5]. He worked as a cook and a conductor between February 2008 and April 2010, with a layoff between January 15, 2009 and March 21, 2009. [*Id.*; #61-4 at 4, 57:25-58:2[3]]. Mr. Chalepah began working as a full-time conductor on April 14, 2010 and became an engineer in October 2011. [#61-1 at ¶ 5; #61-4 at 4, 60:21-23]. Plaintiff worked as an engineer until RGRR terminated his employment on November 7, 2012. [#61-1 at ¶ 5].

As a conductor, Mr. Chalepah was responsible for helping the engineers operate the train, ensuring the safety of passengers, and addressing any emergencies that arose on the train. [#61-4 at 4, 60:2-7]. As an engineer, Mr. Chalepah was responsible for operating the train and occasionally performing duties of conductor. [*Id.* at 60:17-20]. Plaintiff enjoyed working as a conductor and an engineer and prior to his termination sought certification as a "Designated Service Lead Engineer." [*Id.* at 58:16-59:3]. RGRR does not have a position with the title of Designated Service Lead Engineer, but it does appoint an employee with the title of Designated Supervisor of Locomotive Engineers ("DSLE"), which is a designation required by the Federal

---

proving its case, *e.g.*, caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously deemed admitted." *Id.*

[3] Citations to deposition transcripts reflect the page and line assigned within the transcript.

Railroad Administration ("FRA").  [#61-1 at ¶ 7].  In 2012, RGRR appointed Mr. Gay as DSLE because he was the only RGRR employee who was qualified for the position.  [#62-4 at ¶¶ 1, 4]. The DSLE designation does not constitute a promotion and does not include a pay raise; it is simply a position that the FRA required RGRR to fill.  [*Id.* at ¶ 4].

Chad Tenorio ("Mr. Tenorio") was RGRR's Superintendent of Operations and Plaintiff's supervisor until September 2012.  [#61-1 at ¶ 8; #61-4 at 5, 61:2-6].  At the time, Steve Kaverman was General Manager and Glenn Hayes ("Mr. Hayes") was Assistant General Manager with RGRR.  [#62-7 at ¶ 6; #62-7 at ¶ 1, #61-4 at 6-7, 68:16-69:6].  Mr. Cacy, who also self-identified as Native American,[4] worked as a conductor. [#61-3 at ¶ 11; #61-4 at 7, 9, 70:18-21, 87:5-7].  Mr. Gay worked as an engineer.  [#61-4 at 9, 86:21-24].  Mike Krammer also worked as an engineer.  [#61-4 at 9, 86:21-24].  Brent Evans worked as maintenance personnel. [#61-4 at 9, 87:8-21].   When Mr. Tenorio left, Mr. Chalepah voiced his interest in the Superintendent of Operations position to Mr. Hayes, but did not otherwise apply for the job. [#61-4 at 8, 81:12-82:2].   Mr. Hayes told Plaintiff that RGRR would "keep [him] in mind and let [him] know how [RGRR is] going to move forward with the position."  [*Id.*]  Rather than replace Mr. Tenorio, RGRR allocated the superintendent duties between two new positions: Operations Manager and Chief Mechanical Officer.  [#61-1 at ¶ 9; #61-4 at 8, 82:7-17].  On November 1, 2012, RGRR announced that Mr. Cacy had been selected for the Operations Manager position and Brent Evans would serve as the Chief Mechanical Officer.  [#61-1 at ¶¶ 10-11; #61-4 at 8, 84:12-15].  These individuals were expected to maintain some responsibilities of their former positions.  [#61-1 at ¶ 9; #62-7 at ¶ 5].

---

[4] Plaintiff testified that he believes Mr. Cacy spoke of being Native American at work and that other RGRR employees knew he was Native American.  [#61-5 at 1, 107:22-9].  He further

Mr. Cacy was appointed Operations Manager because he had assumed and been performing many of the position's duties prior to Mr. Tenorio's departure. [#61-1 at ¶ 10; #61-3 at ¶ 4; #62-7 at ¶ 5; #84-1 at ¶ 6]. Such duties included record keeping, rail operations maintenance, completion of paperwork required by the FRA, and assisting with the scheduling and management of maintenance projects. [#61-1 at ¶ 10]. Mr. Evans was appointed Chief Mechanical Officer because he was the only journeyman electrician and certified diesel mechanic and RGRR's "most qualified mechanic and was familiar with the maintenance duties associated with [the] job." [#61-1 at ¶ 10; #63-1 at ¶ 2]. Following these promotions, Plaintiff did not complain to RGRR that Mr. Cacy or Mr. Evans was not qualified to hold their new positions. [#61-4 at 9, TR: 88:19-25].

<u>Plaintiff's Suspension and Subsequent Termination</u>

Mr. Chalepah was upset that he was not promoted to the Operations Manager position. [#61-4 at 11, 97:21-23; #69-6 at 31]. On November 3, 2012, Plaintiff arrived two hours late to work after informing his co-workers, but not his manager, that he would be late. [#61-4 at 11, 97:3-9; #69-6 at 30]. On November 5, 2012, Mr. Chalepah left work in a company truck to fill it with gas. [#61-4 at 11, 99:8-10]. Mr. Cacy asked him to return to work because another employee needed the company gas card. Mr. Chalepah responded by text message, "No s\*\*t. Why don't he drive down here." [*Id.* at 99:11-19 101:1-102:4; #61-3 at ¶ 7]. Ms. Keegan and Mr. Hayes learned of the text message that day. [#61-3 at ¶¶ 7, 8; #61-1 at ¶ 16; #84-1 at ¶ 18]. RGRR, through Ms. Keegan and Mr. Hayes, suspended Mr. Chalepah on November 5, 2012 "for the text message and other things that have come to light." [#61-1 at ¶¶ 16-17; #62-7 at ¶ 9; #61-4 at 11, 99:25-100:5]. Ms. Keegan and Mr. Hayes terminated Plaintiff on November 7, 2012 for

_____

testified that Mr. Cacy has a tattoo on his arm of a Peyote bird, a Native American symbol, and

stated reasons of insubordination and disruptive behavior.  [#61-1 at ¶¶ 17, 19; #62-7 at ¶¶ 8-10].  Mr. Chalepah denies that he was angry or insubordinate.  However, he does not deny reporting to work late or sending a profane text message to Mr. Cacy.  *See* [#61-4 at 11, 97:1-9, 99:8-24].

Following his termination, Plaintiff filed a Notice of Charge of Discrimination.  *See* [#69-6 at 33].  On or about November 9, 2012, Mr. Chalepah applied for unemployment benefits.  [#69 at 16, ¶ 42].  On December 10, 2012, the Colorado Department of Labor and Employment ("CDLE") determined that Plaintiff was entitled to benefits.  [#69-6 at 37].  RGRR appealed that decision [#69-6 at 41], which was subsequently affirmed.  [#69-6 at 53-55; #69-7 at 21-23].  Plaintiff received a Notice of Right to Sue from the EEOC on May 20, 2013.  [#69 at 19, ¶ 57].

<u>Temporary Civil Protection Order</u>

On April 4, 2011, RGRR issued a formal written notice to Mr. Chalepah that his possession of a firearm on company property violated the "Anti-Violence" section of the RGRR Employment Handbook.  [#63-2]; *see* [#84-1 at ¶ 27].  After Plaintiff was terminated, Mr. Cacy attested to observing him on RGRR property and drive past the company's maintenance shop several times.  [#61-3 at ¶ 12]; *see* [#84-1 at ¶ 28].  Around this time, when RGRR was challenging Plaintiff's application for unemployment benefits, several of its trains were vandalized amounting to approximately $2,000 in damages.  [#61-1 at ¶ 21].  Ms. Keegan contacted the Canon City Police Department ("CCPD") with the above facts and the CCPD completed a police report.  [#61-1 at ¶ 22; #62-5].  Ms. Keegan then sought a civil protection order against Plaintiff because she believed that he "posed a threat to RGRR, its property, and the safety of RGRR employees and customers."  [#61-1 at ¶ 23].  On April 4, 2013, the County

---

that Plaintiff has the same tattoo.  [*Id.* at 108:9-15].

Court in Fremont County, Colorado issued a temporary civil protection order against Mr. Chalepah.  [#62-6; #69-7 at 4-10].[5]

RGRR Employment Handbook

The RGRR Employment Handbook (the "Handbook") instructs that it, or receipt of it, "does not give rise to any enforceable contractual rights relating to the continuing employment or receipt of benefits between [RGRR] and its employees."  [#61-2 at 2].  The Handbook provides that employment with RGRR is at-will, that "any verbal statements made by management are not intended to constitute a contract of employment, either express of implied, nor are they a guarantee of employment for a specific duration," and that only the owners of RGRR have authority to enter into an employment agreement for a specified period of time and such agreement must be in writing and signed by an owner and the employee.  [*Id.*]

The Handbook also prohibits "unlawful harassment because of race…color…national origin…or any other applicable status protected by state or local law," and defines unlawful harassment as "verbal or physical conduct, which has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment."  [#61-2 at 4].  This policy applies to all employees, "including managers, supervisors, [and] co-workers."  [*Id.*]  Relevant to the pending Motion for Summary Judgment, the Handbook instructs that employees who will be absent or late to work "must speak to their immediate supervisor or another manager as soon as possible prior to the start of their shift.  Leaving messages with other employees or on voice mail is not acceptable."  [#69-6 at 9].

---

[5] Plaintiff attests in his affidavit in support of Sur-Reply that RGRR was ultimately unsuccessful in obtaining a permanent restraining order against him, that he "won the Restraining Order" and that the state court judge who presided over the hearing stated, "the inference there that the court would draw, that if anybody might have a grudge, it might the Royal Gorge Railroad."  [#84-1 at

Mr. Chalepah understood that he could quit his job at any time and that RGRR could terminate its employment relationship with him as long as the termination did not stem from an unlawful reason.   [#61-5 at 2-3, 112:23-113:4].   Mr. Chalepah did not sign a contract with RGRR, did not enter into a written agreement with the owners of RGRR, and understood that the Handbook did not constitute a contract of employment.   [*Id.* at 3, 113:12-114:8].

## STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994).   "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"   *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).   Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law.   *Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987).   A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248.   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"   *Matsushita Elec.*

---

¶¶ 31, 32].  Plaintiff did not cite to the record however, and this court was not able to locate in the record a transcript of or order from this proceeding.

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002).  However, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case. *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir. 1994) (citation omitted).  When, as here, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998) (citation omitted).  *See also Anderson*, 477 U.S. at 256 (The nonmovant "may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."). Conclusory statements based merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence.  *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded.  *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998).

"A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)).  While Mr. Chalepah initiated this action as a *pro se* litigant, he was represented by counsel when the Motion for Summary Judgment was filed and throughout the briefing process.  *See* [#40].

## ANALYSIS

### I.    Title VII Discrimination

Title VII prohibits discrimination against any individual "with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21 (1993) (citing 42 U.S.C. § 2000e–2(a)(1)).   Mr. Chalepah claims that he was terminated from his employment with RGRR because of his color and race.

A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).   *See Crowe v. ADT Sec. Servs. Inc.,* 649 F.3d 1189, 1194 (10th Cir. 2011).   Where there is direct evidence of discriminatory intent, the court need not address the shifting allocations of burdens of proof under *McDonnell Douglas*.  *Furr v. AT & T Techs., Inc.,* 824 F.2d 1537, 1549 (10th Cir. 1987).   "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Riggs v. AirTran Airways, Inc.,* 497 F.3d 1108, 1117 (10th Cir. 2007) (brackets omitted) (internal quotation marks omitted).   This evidence must "speak directly to the issue of discriminatory intent" as well as "relate to the specific employment decision in question." *Chytka v. Wrigth Tree Service, Inc.*, 925 F. Supp. 2d 1147, 1162 (D. Colo. 2013) (citation omitted).   Plaintiff testified that Mr. Evans referred to him as "UPS," asked, "[w]hat can brown do for you," and stated that because Plaintiff had brown colored skin, "if you give him a shovel, he won't stop till you tell him to."   [#61-4 at 10, 91:3-17].   Plaintiff further testified that he was aware that Mr. Kaverman made a comment to Mr. Tenorio "about [his] nationality and that people of [his] nationality…can't handle their liquor." [#61-5 at 106:4-12].   Comments in the workplace that reflect personal bias may qualify as direct

14

discrimination if the speaker had decision making authority and acted on his discriminatory beliefs. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *Ramsey v. City & Cnty. of Denver,* 907 F.2d 1004, 1007–08 (10th Cir. 1990)).   However, Mr. Evans was not in a decision-making role.   In addition, there is no evidence in the record that Mr. Evans ever supervised Plaintiff.   *See* [#61-4 at 3, 4-5, 8, 9, TR: 56:14-23, 60:21-61:4, 84:21-23, 87:8-21]. Nor is there evidence that Mr. Evans was involved in the decision to appoint Mr. Cacy as Operations Manager or terminate Plaintiff [*see* #61-1 at ¶¶ 12, 18; #62-7 at ¶¶ 5, 6, 10], let alone that Mr. Evans acted on any personal bias towards Mr. Chalepah.   Similarly, while Mr. Kaverman was a member of RGRR management, Plaintiff could not identify at his deposition when Mr. Kaverman made the alleged comment to Mr. Tenorio, and Plaintiff has not demonstrated that Mr. Kaverman was motivated by a personal bias in any decision to promote or fire Plaintiff. [6]   [*See* #61-5 at 1, 107:6-11].   Mr. Chalepah also does not adduce any evidence that either Mr. Hayes or Ms. Keegan ever acted with any bias based on discriminatory motive against him.   Accordingly, Mr. Chalepah has not established an incidence of direct discrimination and this court will analyze his Title VII claim pursuant to the *McDonnell Douglas* test.

Under *McDonnell Douglas*, Mr. Chalepah must first set forth a *prima facie* case of discrimination, which requires that he establish (1) he is a member of a protected class, (2) he

---

[6] Plaintiff asserts in his affidavit in support of Sur-Reply that Mr. Evans and Mr. Kaverman were "individual[s] [who had made] racial comments throughout [Plaintiff's] tenure with the RGRR [who] got to make a decision to terminate [him]."   [#84-1 at ¶ 23].   However, these attestations simply do not demonstrate that Mr. Evans or Mr. Kaverman applied a personal bias to any decision regarding Plaintiff's employment with RGRR.   *See Ramsey*, 907 F.2d at 1008 (for evidence to constitute direct evidence of discriminatory conduct, "it would need to show, not simply personal bias, but that the employer acted on his or her discriminatory beliefs.").   *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision.").

applied for an available position for which he was qualified, and (3) he was rejected under circumstances which give rise to an inference of unlawful discrimination. *Tabor*, 703 F.3d at 1216 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)). The *prima facie* burden is "slight," *Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 (10th Cir. 2005), and, if demonstrated, requires RGRR to articulate a nondiscriminatory reason for the adverse employment action. *See Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012). Plaintiff may then present evidence to show that RGRR's rationale is pretextual. *See Fye v. Okla. Corp. Comm'n,* 516 F.3d 1217, 1227 (10th Cir. 2008). In order to establish a genuine issue of material fact as to pretext, a plaintiff must produce evidence that a defendant's non-discriminatory reason is "unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995). A plaintiff can meet this burden with "evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (quotation omitted). "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997)).

Mr. Chalepah claims RGRR discriminated against him in three instances: failure to assign him the DSLE designation; failure to promote him to Operations Manager; and decision to terminate his employment. RGRR does not dispute that Plaintiff is a member of a protected class [#60 at 13-14], but rather argues that he was not qualified for the DSLE designation or Operations Manager position, and that the circumstances of his termination do not give rise to an inference of unlawful discrimination. This court agrees.

Plaintiff admits that in October 2012 he did not qualify for the DSLE designation.  [#84-1 at ¶ 8].  In 2012, federal rules required that an engineer have one year of experience to qualify for the designation.  *See* [#69 at 7, ¶ 14].  When Mr. Tenorio left RGRR in September 2012, Mr. Gay had two years' experience as an engineer and Plaintiff had not yet acquired the requisite year.  [#84-1 at ¶ 8].  The DSLE designation was offered to and declined by Mr. Krammer, who had three years' experience; therefore, Mr. Gay, the only employee qualified for the designation, received the DSLE title.  [#61-4 at 9-11, TR: 87:22-88:4, 98:19-99:7; #69 at 7, ¶ 14].  Plaintiff concedes this fact, "Wayne Gay was perhaps the only one qualified for the DSLE position.  Nevertheless, everyone at the RGRR knew that I was just a short step away from getting my own DSLE designation."  [#84-1 at ¶ 9].  The fact that Plaintiff would have soon been eligible for the title is simply not actionable.

Mr. Chalepah also alleges in his Complaint that he was "well qualified for the position of the Superintendent of Operations," (#1 at 3), but RGRR eliminated that position in September 2012.  Plaintiff testified that he does not know what the duties of the Operations Manager position entail or the qualifications and credentials RGRR management considered in filling that role, and he does not believe (and did not complain at the time) that Mr. Cacy was unqualified for the Operations Manager position.  [#61-4 at 9-10, 85:9-19, 86:18-20, 88:19-25].  Indeed, RGRR submitted evidence that Mr. Cacy was the most qualified candidate because under Mr. Tenorio he had already assumed and been performing many of the position's duties, such as managing maintenance projects and processing paperwork required by the FRA.  [#61-1 at ¶ 10; #61-3 at ¶ 4; #62-7 at ¶ 5; #84-1 at ¶ 6].  Only once in Plaintiff's voluminous Response and Sur-Reply does he assert that he was qualified for the Operations Manager position, but he does so without the support of any admissible evidence.  *See* [#84-1 at ¶ 11].  With respect to the Chief

Mechanical Officer position, Plaintiff testified that he is "not as mechanically inclined as Mr. Evans…[that] Mr. Evans…has a degree for diesel engine, so he's inclined…he's more knowledgeable," and that Plaintiff would not have qualified for the position. [#61-4 at 10, 89:4-9; #84-1 at ¶ 8].

As for Plaintiff's termination, RGRR is an at-will employer and thus may discharge an employee at any time so long as the basis for the discharge is not unlawful. [*See* #61-2 at 2]. Plaintiff does not assert that he had a contract for employment with RGRR, thus exempting him from the designation of an at-will employee. There is no dispute that while on the job Plaintiff sent a profane text message to Mr. Cacy that RGRR management deemed inappropriate, and that at least one co-worker took personal time to distance himself from what he described as Plaintiff's "negativity." [#61-1 at ¶¶ 15, 16; #62-4 at ¶ 3; #61-4 at 11-12, 99:11-100:5, 101:11-19]. Nor does Plaintiff dispute that he reported late to work one morning without notifying his manager, in violation of the Handbook.[7] [#61-4 at 11, 97:1-20; #69-6 at 9]. Plaintiff relies on the decision of a CDLE Hearing Officer that he "was performing the work adequately." [#69-6 at 55]. Particularly, that Plaintiff's conduct with respect to the text message was not "so rude, insolent or offensive that a reasonable employer could not countenance it in the circumstances," and that he "was not insubordinate in the respect that he was repeatedly agitating against the employer's policies" or "failing to follow reasonable instructions of the employer." [#69-6 at 55]. However, Plaintiff has not cited authority, and I have found none, to suggest that this court

---

[7] Plaintiff attests that on the morning in question he "called [his] supervisor and requested two hours off" [#84-1 at ¶ 14], yet he testified at his deposition that he only notified his co-workers. [#61-4 at 11, 97:3-9]. Plaintiff cannot assert in his affidavit a position contradictory to his deposition testimony for the purpose of creating a disputed fact. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) ("the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony").

is bound by a CDLE officer's conclusions of law.  Indeed, section 8-74-108 of the Colorado

Revised Statutes specifies that "[n]o findings of fact or law, judgment, conclusion, or final order

made with respect to a determination under articles 70 to 82 of this title may be conclusive or

binding or used as evidence in any separate or subsequent action or proceeding in another

forum…" Colo. Rev. Stat. § 8-74-108.[8]  Moreover, the question before the Hearing Officer was

not whether Plaintiff had been discharged as a result of unlawful discrimination, but whether he

was discharged "under circumstances that did not disqualify him from unemployment insurance

benefits." [#69-6 at 53].  *See Motoyama v. Hawaii, Dept. of Transp.*, 864 F. Supp. 2d 965, 983

n.15 (D. Hawai'i 2012) (agreeing with defendants that the standard for state unemployment

benefits "is different than that in a federal employment discrimination case.").

Mr. Chalepah has not demonstrated that in September 2012 he was qualified for either

the DSLE designation or Operations Manager position, and he has not presented admissible

evidence to demonstrate that his termination occurred under circumstances that give rise to an

inference of unlawful discrimination.  Indeed, Mr. Chalepah testified that he has no evidence that

RGRR failed to promote him, and then terminated him, because he is Native American, [#61-5 at

1, 2, 8, 105:11-16, 107:6-11, 109:15-20, 147:5-10].  *See Plotke v. White*, 405 F.3d 1092, 1107

(10th Cir. 2005) ("plaintiff must show a nexus between the allegedly discriminatory statements

and the employer's decision.").  Because I find that Mr. Chalepah has not established a nexus

between any alleged discriminatory conduct and his failure to be promoted or his termination,

this court concludes that Plaintiff has failed to establish a *prima facie* case of discrimination as to

the DSLE designation and Operations Manager position.  Therefore, I need not consider the

subsequent inquiries of the *McDonnell Douglas* test.  As for RGRR's decision to terminate him,

---

[8] Article 73 governs employment benefits, eligibility, and discrimination.

I find that Plaintiff has not presented evidence to raise a genuine issue of material fact as to whether RGRR's asserted non-discriminatory rationale is pretextual. *See Neal v. Roche,* 349 F.3d 1246, 1252 (10th Cir. 2003) ("[I]t is enough [to grant summary judgment for the employer] if the plaintiff concedes a hidden motivation which the court concludes is nondiscriminatory ...."). While not dispositive, it is probable that RGRR hired another individual who self-identified as Native American for the position for which Plaintiff contends (without support) that he was the most qualified. Accordingly, RGRR is entitled to entry of summary judgment on the discrimination claim.

## II.     Intentional Infliction of Emotional Distress/Harassment

Mr. Chalepah claims that RGRR acted "intentionally, recklessly and/or with deliberate indifference to a substantial probability that severe emotional distress would result to [him]" by "branding [him] as a problematic individual and disciplining him for alleged infractions of company policy," and by terminating him. [#1 at 20, ¶ 77]. Plaintiff further claims that RGRR "knew or should have known that accusations against [him] were false…[and] Defendant ignored the evidence and attempted to coerce and intimidate other employees into implicating [him] in wrong-doing." [*Id.* at ¶ 75]. Finally, Plaintiff claims that RGRR's action toward him constitutes "evidence of a pattern of race discrimination and/or color discrimination which further constitutes extreme and outrageous conduct." [*Id.* at ¶ 78].

Under Colorado law, a plaintiff may recover for the tort of intentional infliction of emotional distress (otherwise known as "outrageous conduct") only where the defendant's behavior is "extremely egregious." *Han Ye Lee v. Colo. Times, Inc.,* 222 P.3d 957, 963 (Colo. App. 2009). Mr. Chalepah must prove that RGRR (1) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing him severe emotional distress, and (3) indeed

caused him to suffer severe emotional distress.  *Id.*; *see also Lammle v. Ball Aerospace & Technologies Corp.*, No. 11–cv–03248–MSK–MJW, 2013 WL 4718928, at * 6 (D. Colo. September 1, 2013).  Outrageous conduct is defined as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994).  To be held liable, RGRR's conduct must be more than "unreasonable, unkind, or unfair; it must truly offend community notions of acceptable conduct." *Bellairs v. Coors Brewing Co.*, 907 F. Supp. 1448, 1459 (D. Colo. 1995).

As an initial matter, Plaintiff cannot proceed with alleged discrimination as the basis for this claim.  *See Emerson c. Wembley USA Inc.,* 433 F. Supp. 2d 1200*,* 1228 (D. Colo. 2006); *see also Katz v. City of Aurora*, 85 F. Supp. 2d 1012, 1021 (D. Colo. 2000) (noting under Colorado law, where the allegations forming the basis of a claim for outrageous conduct are the same as those forming the basis for a claim of discrimination, and nothing more, they fail to state an independently cognizable claim).  Second, the court has deemed admitted RGRR's Requests for Admission Nos. 1-8, which in relevant part substantiate the following: Plaintiff has no evidence that RGRR "ever acted willfully and with knowledge or reckless disregard to [Plaintiff] during [his] employment with Defendant"; at all times during Plaintiff's employment, RGRR "acted in good faith in its dealings with [him]"; and RGRR "exercised reasonable care to prevent and correct any harassing behavior toward [Plaintiff]."  [#62-1 at ¶¶ 1, 2, 4].  On these bases alone Plaintiff cannot prevail on his Fourth Claim.

Furthermore, Mr. Chalepah testified that he had no evidence that RGRR "knew" any accusations levied at him were false, or endeavored to "coerce and intimidate" his co-workers into implicating him in wrongdoing.  [#61-5 at 9-10, 151:23-154:2, 155:1-156:19].  He further

testified that he has no evidence that RGRR knew accusations of his misconduct as an employee were false and nevertheless terminated him. [*Id.* at 10-11, 156:20-159:7, 159:8-24]. However, there is no dispute that Mr. Chalepah, for whatever reason, engaged in using profanity in response to a request to perform a work duty, and that conduct led, at least in part, to his termination. On the record before the court, I cannot conclude that such behavior by RGRR was "extremely egregious," even in light of the CDLE officer's conclusions. In addition, the "mere allegation by an employee that he was dismissed or demoted wrongfully, summarily, or in violation of the employer's policies and procedures fails to state a claim for outrageous conduct." *Bellairs*, 907 F. Supp. at 1459. And, unsupported conclusory allegations do not create a genuine issue of fact. *L & M Enter., Inc. v. BEI Sensors & Sys.,* 231 F.3d 1284, 1287 (10th Cir. 2000). Finally, Plaintiff has not demonstrated that the alleged outrageous conduct actually caused him to suffer severe emotional distress. Therefore, the court concludes that RGRR is entitled to judgment in its favor on Plaintiff's claim for intentional infliction of emotional distress.

## III.    Abuse of Process

The charges brought against Mr. Chalepah by RGRR on or about April 4, 2013 in support of a civil protection order were dismissed on or about May 16, 2013. [#1 at ¶ 87]. Plaintiff claims that RGRR is responsible for Ms. Keegan filing those charges, and that RGRR "knew or should have known that the charges were false and unfounded." [#1 at ¶¶ 87-89]. Plaintiff further claims that RGRR used the "criminal process for self-serving and improper motives and reasons, and to otherwise obtain a collateral benefit from the criminal process." [*Id.* at ¶ 90].

To state a claim for abuse of process under Colorado law, Mr. Chalepah must prove that (1) RGRR acted with an ulterior purpose in invoking a judicial process; (2) its use of the process was in a manner that was inconsistent with proper use; and (3) he suffered damage as a result.

*Tara Woods Ltd. Partnership v. Fannie Mae*, 731 F. Supp. 2d 1103, 1122 (D. Colo. 2010) (citing

*Moore v. Western Forge Corp.,* 192 P.3d 427, 438 (Colo. App. 2007)).   The Colorado Court of

Appeals has cited with approval the following statement:

> If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse, even if the [party] had an ulterior motive in bringing the action or if he knowingly brought suit upon an unfounded claim. Further, while the ulterior motive may be inferred from the wrongful use of the process, the wrongful use may not be inferred from the motive.

*James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail,* 892 P.2d 367, 373 (Colo. App.

1994) (quoting *Institute for Professional Development v. Regis College,* 536 F. Supp. 632, 635

(D. Colo. 1982) (Kane, J.)).   Mr. Chalepah has not proven any of the above elements.

A temporary restraining order preserves the status quo and prevents immediate and

irreparable harm until the court may pass upon the merits of a request for preliminary injunction.

"The essence of a temporary restraining order is its brevity, its ex parte character, and (related to

the second element) its informality."   *Flying Cross Check, L.L.C. v. Central Hockey*, 153 F.

Supp. 2d 1253, 1258 (D. Kan. 2001) (quoting *Geneva Assur. Syndicate, Inc. v. Medical

Emergency Services Associates,* 964 F.2d 599, 600 (7th Cir. 1992)).   Ms. Keegan attested that

during a narrow window of time, RGRR terminated Plaintiff's employment, Plaintiff applied for

unemployment benefits, RGRR disputed his right to those benefits, and RGRR property was

vandalized. [#61-1 at ¶¶ 19, 21].   Mr. Cacy attested that he observed Plaintiff on RGRR property

after he was discharged, and Plaintiff does not dispute this.   [#61-3 at ¶ 12].   Ms. Keegan filed

for the civil protection order on RGRR's behalf on the basis of "stalking" and "physical assault,

threat or other situation," [#69-7 at 4] because she "believed Chalepah posed a threat to RGRR,

its property, and the safety of RGRR employees and customers."   [#61-1 at ¶ 23].   This does not

appear to be an improper use of a restraining order.   Furthermore, Mr. Chalepah testified that he

had no evidence that Ms. Keegan or RGRR knew the charges in support of the temporary civil protection order were false or did not identify what collateral benefit RGRR stood to gain from a civil protection order.   [#61-5 at 13-14, TR: 167:3-6, 168:4-172:6].   Finally, Plaintiff has not demonstrated what damage he suffered as a result of the temporary civil protection order. Therefore, the court finds that on the record before it, judgment against Plaintiff and in favor of RGRR is appropriate.

**IV.**     **Motion to Strike**

RGRR moves to strike portions of Plaintiff's Sur-Reply on the basis that that it "fails to appropriately respond to RGRR's statements of undisputed fact" and is deficient as a matter of law.  [#87 at 2].  Because, as RGRR asserts in the Motion, Plaintiff's evidence is "insufficient to create an issue of material fact," and the court grants summary judgment in favor of RGRR on each of the remaining three claims, the Motion to Strike is DENIED AS MOOT.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment [#60] is GRANTED and the Motion to Strike [#87] is DENIED AS MOOT.

DATED:  August 31, 2015                    BY THE COURT:


                                            s/ Nina Y. Wang
                                            United States Magistrate Judge